STATE of Utah, Plaintiff and Appellee,

v.

James Louis HOLLAND, Defendant
and Appellant.

No. 870410.

Supreme Court of Utah.

June 21, 1989.

David L. Wilkinson, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

Elliott Levine, Salt Lake City, for defendant and appellant.

STEWART, Justice:

This is an automatic appeal from a conviction of capital homicide pursuant to Utah Code Ann. § 76–5–202(1)(h) (Supp. 1988) and a sentence of death imposed pursuant to Utah Code Ann. § 76–3–206(1) (1978).

James Louis Holland met the victim, Sandy Patt, at a truck stop in Idaho, July 5 or 6, 1986. The victim offered the defendant a ride to Beaumont, Texas, if the defendant would share the driving. On leaving Ogden, Utah, the victim was driving and Holland was in the passenger seat. Near Echo Junction, Utah, on Interstate 84, Patt stopped the car and without explanation ordered the defendant out. It was cold and raining at the time. The defen-

dant pulled a gun from his waistband, laid it across his lap, and directed Patt to continue driving. Patt grabbed for the gun with one hand while simultaneously scratching the defendant about the face with the other. While wrestling with Patt, the defendant shot five rounds. One round hit Patt in the head behind the right ear. The other shots were scattered about the automobile. Holland left the victim's body just off the shoulder of the road and drove on in the victim's automobile. About a year later, the defendant was apprehended in Florida. On the trip back to Utah, the defendant confessed in some detail to the shooting that resulted in Mr. Patt's death.

On September 1, 1987, the defendant pleaded guilty to a charge of first degree murder, and on September 17, 1987, the trial court held a sentencing hearing to determine whether the sentence should be life imprisonment or death.

The defendant waived a jury for the penalty phase, and the matter was heard by the Honorable Homer F. Wilkinson. The evidence shows that the defendant has an extensive record of criminal activity, including a 1966 conviction for second degree murder in Iowa. In addition, the defendant shot and killed another person at the Juniper Truck Stop in Idaho.

Shortly before the penalty phase was to commence, the defendant consented to an interview with Dr. Michael D. DeCaria, a psychologist. On the day scheduled for the penalty hearing, Dr. DeCaria indicated that he needed more time to evaluate certain unspecified information that had recently come into his possession. Although the defendant initially agreed with Dr. DeCaria's and counsel's request for more time, and although the trial court was willing to grant a continuance, the defendant changed his mind, notwithstanding the efforts of his attorney to persuade him otherwise, and insisted that the penalty hearing proceed. After a forty-five-minute recess, during which the defendant and his counsel conferred about the matter, the defendant again insisted, on the record, that the penalty phase proceed. Dr. DeCaria then testified that the defendant was not competent

to proceed with the penalty hearing because he was extremely depressed. At the conclusion of the hearing, the judge imposed the death penalty.

On this appeal, the defendant contends that (1) Utah Code Ann. § 76–5–202(1)(h), that part of the capital homicide statute under which defendant was charged, violates the constitutional guarantee against double jeopardy under both the Utah and the federal Constitution; (2) the trial court erred in imposing the death penalty in light of "uncontroverted evidence that there were doubts as to the defendant's competency to proceed with the penalty phase" and that he suffers from a psychological disorder; (3) the Utah death penalty statute is unconstitutional because it allows too much discretion in the sentencing authority; (4) failure of this Court to review the death sentence for proportionality results in an arbitrary and capricious imposition of the death penalty; (5) the capital homicide statute is unconstitutional because the death penalty is imposed without a specification of the reasons relied on by the sentencing authority and hence there can be no effective and meaningful appellate review; and (6) the death penalty is unconstitutional because prosecutorial discretion in charging and trying capital cases results in arbitrary and capricious imposition of the death penalty.

## I. THE ATTORNEY GENERAL'S ROLE IN AUTOMATIC APPEALS IN CAPITAL CASES

■ The State has declined to file a brief that is responsive to the brief filed by the defendant's counsel on the ground that the defendant has expressed his desire not to appeal his death sentence. According to the State, this Court should only review the record for manifest, prejudicial error, *see* *State v. Tillman*, 750 P.2d 546, 551–53 (Utah 1987), and therefore the State need not respond to the defendant's points on appeal. To quote the State's brief:

> The more appropriate approach would be to conduct a hearing in which this Court could determine whether defendant's attempts to waive his right to an

appeal are knowing, voluntary, and intelligent. . . . The fact that the automatic review statute exists, does not preclude a defendant from waiving his right to submit briefs to the Court raising issues he has no desire to raise.

The State takes its position even though the governing statute, § 77–35–26(10) (Supp.1988), provides that "[i]n capital cases where the sentence of death has been imposed, and the defendant has chosen not to pursue his own appeal, the case shall be automatically reviewed by the Supreme Court. . . ." Thus, our duty to review the case, at least for plain error, is clear even when the defendant fails to file a brief. In this case, we specifically ordered defense counsel to file a brief to assist this Court in discharging its responsibility, yet the State has declined to respond to defense counsel's brief because, as the State's brief declares, "the order is contrary to defendant's wishes. . . ."

The Attorney General's office has institutional and professional obligations in criminal cases, irrespective of what the defendant does. That office has a special responsibility in criminal cases to ensure that justice is done, and that is especially the case when the defendant defaults in presenting his case. The comment to Rule 3.8 of the Utah Rules of Professional Conduct states: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." The automatic appeal statute was designed to serve institutional ends of great importance. First, the State should always be concerned about the legal effect of a defendant's waiver of further judicial proceedings when a death sentence has been imposed. No matter how much a defendant may wish to be put to death, it is not the duty, and certainly not the right, of the State to effectuate that wish. The State does not have the authority to execute a person unless that person merits that sanction under the applicable provisions of the criminal law.

We are aware that a sane defendant may, at one point or another in the judicial process, wish to waive further judicial protections, and that appears to be so in this case; however, we intimate no conclusion on the point. Nevertheless, the integrity of the law as an institution must be sustained, notwithstanding the desire of an individual defendant. While Utah law does not compel a defendant sentenced to death to go through every procedure that a defendant might voluntarily invoke, the law does require one automatic appeal even when "the defendant has chosen not to pursue his own appeal. . . ." § 77–35–26(10) (Supp.1988). Imposition of a death sentence is carried out in the name of the people of the state of Utah through their duly authorized governmental institutions, and they are authorized to act only in conformity with the law of the land. Execution of a criminal defendant may not occur, therefore, until this Court determines at least that the sentence is in accord with lawful process. In making that determination, the assistance of the Attorney General's office is appropriate and necessary.

## II.  DOUBLE JEOPARDY

█ Defense counsel asserts that the statute under which Holland was charged and pleaded guilty violates his constitutional guarantees against double jeopardy.[1] Holland was charged with and pleaded guilty to one count of murder in the first degree under Utah Code Ann. § 76–5–202(1)(h) (Supp.1988), which states:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

. . . .

**1.** Holland asserts that the statute violates his constitutional guarantees against double jeopardy found in both the Fifth Amendment of the United States Constitution and Article I, section 12 of the Utah Constitution. The issue has not been briefed under the state constitution, and therefore, we will not address the merits under the state constitution. *See State v. Earl,* 716 P.2d 803, 805–06 (Utah 1986).

(h) The actor was previously convicted of first or second degree murder or of a felony involving the use or threat of violence to a person. For the purpose of this paragraph an offense committed in another jurisdiction, which if committed in Utah would be punishable as first or second degree murder, is deemed first or second degree murder.

Holland was previously convicted of second degree homicide in Iowa and sentenced in October, 1964, to a term of imprisonment in the Iowa state penitentiary.[2] Holland contends that by elevating what otherwise would be a second degree homicide to a capital offense *see State v. Standiford,* 769 P.2d 254, 259 (Utah 1988) solely because of the previous offense in Iowa, the statutory provision imposes a second punishment for the Iowa crime.

■ In our two previous cases dealing with this subsection, we have not had to address this constitutional contention. *State v. Gardner,* 101 Utah Adv.Rep. 3, (January 31, 1989) (rehearing pending); *State v. James,* 767 P.2d 549 (Utah 1989). Before addressing the issue, we make one observation—that ordinarily a plea of guilty constitutes a waiver of procedural irregularities. However, a plea of guilty does not by itself constitute a waiver of a double jeopardy claim. *See Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (per curiam). *But cf. United States v. Broce,* — U.S. —, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). Thus, the issue raised by Holland's counsel is legitimately before us.

■ The Double Jeopardy Clause affords three separate constitutional protections. Under the clause, either an acquittal or a conviction on a particular charge bars another prosecution on the same charge. The clause also bars multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969); *State v. Dyer,* 671 P.2d 142, 146 (Utah 1983).

■ Holland asserts that the elevation of the degree of a subsequent homicide from a second to first degree murder constitutes a multiple punishment for the same offense. We disagree. In *Graham v. West Virginia,* 224 U.S. 616, 623, 32 S.Ct. 583, 585, 56 L.Ed. 917 (1912), the United States Supreme Court held constitutional the imposition of a more severe punishment of a defendant for committing a subsequent offense:

The propriety of inflicting severer punishment upon old offenders has long been recognized in this country and in England. They are not punished the second time for the earlier offense, but the repetition of criminal conduct aggravates their guilt and justifies heavier penalties when they are again convicted.

*See also Moore v. Missouri,* 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301 (1895); *State v. Bailey,* 712 P.2d 281, 286–87 (Utah 1985).

Furthermore, statutes which increase the severity of a crime which is repeated, and not just the severity of the penalty, have been upheld against a double jeopardy challenge. *Cassese v. New York,* 530 F.Supp. 694, 695 (E.D.N.Y.1982), sustained the constitutionality of a statute which raised criminal possession of a weapon from a misdemeanor to a felony for an offender who had previously been convicted of a felony and then permitted sentencing as a second felony offender. *See also State v. Tobin,* 333 N.W.2d 842, 845 (Iowa 1983); *People v. Fisher,* 97 A.D.2d 651, 469 N.Y. S.2d 187 (1983).

A person who commits a second intentional homicide is more culpable than one who has not repeated the act, and it is not unconstitutional to make the second intentional homicide a capital offense. *Arthur v. State,* 472 So.2d 650, 657 (Ala.Crim.App. 1984), *rev'd on other grounds,* 472 So.2d 665 (Ala.1985). In sum, § 76–5–202(1)(h) does not violate the Double Jeopardy Clause of the federal Constitution.

### III. PSYCHOLOGICAL INTERVIEW AND EVIDENCE OF COMPETENCY

■ The defendant's counsel contends that the trial court erred in not continuing

**2.** The information in this case wrongly states that the defendant was convicted of homicide in

Florida in 1975. No such conviction appears in the record of this case.

to a later time the penalty phase at counsel's request to give a retained psychologist additional time to interview the defendant.

The defendant himself resisted the continuance, and neither counsel nor the psychologist, who testified at length on the basis of a prior two and one-half-hour interview with the defendant, indicated to the trial judge what new information might be developed or explored that might assist the defendant in even a small way. The psychologist stated his opinion, after a foundation was established for it, that the defendant was "extremely depressed" and therefore not competent to plead guilty. However, no motion was made to withdraw the guilty plea, and our careful reading of the entire record, including numerous interchanges between the defendant and the trial judge, clearly indicates that the defendant fully knew and understood the nature of the proceedings and charges against him and was competent to assist in the proceedings against him. Clearly, the trial judge offered the defendant every opportunity to take additional time if he desired, but every offer was firmly rejected.

We do not challenge Dr. DeCaria's judgment that the defendant suffers from depression, but we conclude from the transcript that the defendant was clearly aware of the nature of the proceedings against him, knew the consequences of both the proceedings and the decisions he made with respect to them, and knew that the death penalty could be imposed. *See State v. Lafferty,* 749 P.2d 1239, 1243–48 (Utah 1988).

Nevertheless, for reasons that appear below, this case must be remanded for a new penalty determination. We are confident that on remand the trial judge will proceed with proper circumspection, and if there is any question as to the defendant's competence, the trial court should hold a hearing on the point, irrespective of the defendant's wishes. We do not know, and will not try to anticipate, what decision the trial judge will make at the new penalty proceeding, but a death penalty may be imposed only if there is full compliance with the law in every particular.

## IV. CONSTITUTIONAL CHALLENGES TO THE UTAH DEATH PENALTY STATUTE

■ Other issues raised by defense counsel challenging the constitutionality of the Utah statute, with the exceptions discussed below, have been raised and disposed of in previous cases contrary to the defendant's contentions. Specifically, the following issues have been addressed and rejected: (1) unconstitutionality of the death penalty scheme because it allows either too much discretion or unguided discretion in the imposition of the death penalty, *see State v. Tillman,* 750 P.2d 546, 572 (Utah 1987); *State v. Wood,* 648 P.2d 71, 81–83 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); *State v. Brown,* 607 P.2d 261, 268–71 (Utah 1980); *see also Andrews v. Shulsen,* 802 F.2d 1256, 1260–62 (10th Cir.1986), *aff'g, Andrews v. Shulsen,* 600 F.Supp. 408, 420–24 (D.Utah 1984), *cert. denied,* — U.S. ——, 108 S.Ct. 1091, 99 L.Ed.2d 253 (1988); *Pierre v. Shulsen,* 802 F.2d 1282, 1283 & n. 2 (10th Cir.1986), *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987); (2) lack of appellate proportionality review, *see Tillman,* 750 P.2d at 561–62; *Wood,* 648 P.2d at 77; *State v. Pierre,* 572 P.2d 1338, 1345 (Utah 1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978); (3) failure to specify the aggravating circumstances found to warrant imposition of the death penalty, *see Andrews v. Shulsen,* 802 F.2d at 1261; *see also Jurek v. Texas,* 428 U.S. 262, 265 n. 1, 96 S.Ct. 2950, 2953 n. 1, 49 L.Ed.2d 929 (1976); *Brown,* 607 P.2d at 268; *State v. Pierre,* 572 P.2d at 1348; (4) unfettered prosecutorial discretion (a variation of (1) above), *see Tillman,* 750 P.2d at 562, where the Court rejected a broad claim of disproportionality including an assertion of specific prosecutorial abuse in charging a capital offense. *See also Gregg v. Georgia,* 428 U.S. 153, 199, 224–26, 96 S.Ct. 2909, 2937, 2948–50, 49 L.Ed.2d 859 (1976) (opinions of Stewart, J., and White, J.).

## V. SPECIFICATION OF REASONS FOR IMPOSING THE DEATH PENALTY

■ One of the issues we have not heretofore fully addressed is the contention that appellate review of a death penalty is inadequate because there is no specification on the record of the reasons the sentencing authority relies on in imposing the death penalty. Defense counsel cites *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), in support of his argument. In *Gardner,* the Supreme Court vacated a death sentence imposed by a trial judge because evidence was used at the penalty phase which was not disclosed to the defendant and which was not included in the appellate record. *Gardner* is not on point. All aggravating evidence in this case was presented in open court, and the defendant was given ample opportunity to refute and rebut that evidence. There was no withheld or secret evidence, as in *Gardner.* Beyond that, the law does not require the sentencing authority to set forth its specific reasons for imposing the death penalty.

■ The Utah statute authorizing imposition of the death sentence imposes a number of restrictions and guidelines to channel the sentencing authority's exercise of discretion and to avoid capricious death penalties. The State has the burden of proof as to the existence of aggravating factors and must show that they "outweigh" the mitigating factors. *State v. Pierre,* 572 P.2d at 1347–48. The sentencing authority must apply the beyond-a-reasonable-doubt standard twice in the sentencing process in the two-step procedure established in *Wood,* 648 P.2d at 79–85. Furthermore, this Court will review the sentence for proportionality of the penalty on the facts of the case before the Court. *Wood,* 648 P.2d at 77 (see Part VI, *infra*). The care with which this Court has dealt with capital cases in general is evidenced by the fact that this Court has reversed death penalties in *State v. Norton,* 675 P.2d 577 (Utah 1983), *cert. denied,* 466 U.S. 942, 104 S.Ct. 1923, 80 L.Ed.2d 470 (1984); *State v. Wood,* 648 P.2d 71 (Utah), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982); and *State v. Brown,* 607 P.2d 261 (Utah 1980). On the other hand, we have sustained death penalties in other cases, including *State v. Bishop,* 753 P.2d 439 (Utah 1988); *State v. Tillman,* 750 P.2d 546 (Utah 1987); *State v. Lafferty,* 749 P.2d 1239 (Utah 1988); *State v. Andrews,* 574 P.2d 709 (Utah 1977); and *State v. Pierre,* 572 P.2d 1338 (Utah 1977). Given the procedures required at trial and the careful appellate review given by this Court to death penalty cases over the years, a specification of reasons by the sentencing authority on the record for imposing the death penalty, even if it were practicable, is not necessary to prevent arbitrary and capricious sentences. *Brown,* 607 P.2d at 268. Indeed, such a procedure would be extraordinarily cumbersome, especially when a jury would have to agree unanimously on a statement of reasons under the process outlined in *Wood.*

## VI. PROPORTIONALITY

■ The defendant also contends that the Utah death penalty statute is unconstitutional because it does not provide for a review of the proportionality of the death sentence.

However, this Court has indicated that it will review death sentences for proportionality. In *Wood,* 648 P.2d at 77, we stated: "In the penalty phase, it is our duty to determine whether the sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate." *See also State v. Andrews,* 574 P.2d at 710–11; *State v. Pierre,* 572 P.2d at 1345. However, we have made clear subsequently that neither this Court nor the trial courts need undertake a broad evidentiary inquiry into the variables that might affect when and under what circumstances juries throughout the state have imposed death penalties. *Tillman,* 750 P.2d at 562.

Our statement in *Wood* about proportionality is, however, meaningful. It means that this Court will not allow sentencing authorities to impose the death penalty in an invidious fashion against particular types of persons or groups of persons or in

a fashion disproportionate to the culpability in a particular case. The statement also means that over time, as this Court becomes aware of a general pattern in the imposition of the death penalty in this state, the Court may set aside death sentences that fall outside the general pattern and thus reflect an anomaly in the imposition of the death penalty. But that does not mean that a defendant is entitled as a matter of course to determine how the capital sentencing scheme has been administered generally by trying to compare the facts and circumstances of capital cases on a case-by-case basis. *Tillman,* 750 P.2d at 562. *See generally Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

With few exceptions, juries in this state have not opted for death penalties when a defendant has committed only a single murder; for the most part death penalties have been imposed when the defendant was involved in multiple murders, either at the time of the particular homicide charged or at some other time. *See, e.g., Gardner,* 101 Utah Adv.Rep. at 10; *Bishop,* 753 P.2d at 446; *Lafferty,* 749 P.2d at 1241–42; *Norton,* 675 P.2d at 580; *Brown,* 607 P.2d at 262–64; *State v. Andrews,* 574 P.2d at 710–11; *State v. Pierre,* 572 P.2d at 1342–44. Experience has not demonstrated that the Utah death penalty statute has resulted in disproportionate sentencing.

## VII. PLAIN ERROR IN SENTENCING

■■■ In capital cases, this Court engages in a "comprehensive review" of the record for manifest or plain error,[3] whether or not raised for the first time on appeal and even though there was no objection at trial; furthermore, we will determine whether the "sentence resulted from prejudice or arbitrary action or was disproportionate." *State v. Pierre,* 572 P.2d at 1345; *see also Tillman,* 750 P.2d at 551–53; *Wood,* 648 P.2d at 77; *State v. St. Clair,* 3 Utah 2d 230, 243–44, 282 P.2d 323, 332 (1955); *State v. Stenbeck,* 78 Utah 350, 2 P.2d 1050 (1931).

■■■■ It is evident on the face of the record that the trial court committed plain error in the sentencing phase of this case by failing to follow the procedure established in *Wood,* 648 P.2d at 83–85, for determining whether the death penalty or a life sentence should be imposed. In *Wood,* we clearly stated that the sentencing authority must apply a two-step evaluation process:

> After considering the totality of the aggravating and mitigating circumstances, you [i.e., the sentencing authority] must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and you must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances.

648 P.2d at 83 (quoting *State v. Wood,* 648 P.2d 71 (Utah 1981) (per curiam)). We explained further that a sentencing authority must compare

> the totality of the mitigating against the totality of the aggravating factors, not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness. Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sentencing body, in making the judgment that aggravating factors "outweigh," or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the conclusion that the death penalty is justified and appropriate after considering all the circumstances. This means that upon consideration of all the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

648 P.2d at 83–84.[4]

---

**3.** For a discussion of the plain error doctrine, see *State v. Eldredge,* 773 P.2d 29, 34–35 (Utah 1989).

Thus, *Wood* established a two-step formula for deciding whether imprisonment or death should be the sentence. The first step is to determine whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. The second step is to determine whether the death penalty is appropriate under all the circumstances of the case and in light of the circumstances of the defendant's background and life as a whole.

The trial judge did not follow the *Wood* formula. After listing the various factors which he found to be aggravating and mitigating, the trial court found only that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and then, on that basis alone, he concluded that the death penalty should be imposed:

> The court does find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. So the court does sentence the defendant, James Louis Holland, for the crime of—for a capital crime, a capital felony, and does impose the death penalty upon the defendant, and that it should be carried out by the firing squad or the administering of lethal intravenous injection, that being at the option of the defendant.

However, the judge did not decide whether, based on all the circumstances, the death penalty was justified and appropriate beyond a reasonable doubt.[5]

The second part of the *Wood* formula is critical. It is not repetitious of the first part, and it is not to be applied in a mechanical or unthinking fashion. The United States Supreme Court has stated, "The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976)). It is precisely this "special need for reliability" that the second part of the *Wood* test is especially designed to serve.

The second part of the *Wood* test is essential because of the nature of the first part of the test. There is a tendency to deal with the aggravating and mitigating factors in a mechanical fashion and the "weighing" process is inherently imprecise. As noted in *Wood*, the "weighing" of aggravating against mitigating circumstances that is required by the first part of the test suggests a mental process that is far more precise and logical than is possible. *Wood*,

---

4. In *Wood*, we further explained:

> Although we speak of "weighing" the aggravating and mitigating factors, we realize that the term "weighing" is often used in determining the truth or falsity of factual propositions. In the context of a penalty hearing, however, that term is akin to a metaphor which is not altogether descriptive of the mental process involved. The ultimate purpose in the penalty phase is not one of factfinding, but the fixing of a penalty, and the fixing of a penalty is a matter of judgment about what penal consequences should attach to the commission of a capital crime by a particular defendant. The reasonable doubt standard is, of course, also employed as a standard for factfinding; but that standard, which is only used when the most basic interests of the individual are at stake, also conveys to a decision maker a sense of the solemnity of the task and the necessity for a high degree of certitude, given the nature of the values to be weighed, in imposing the death sentence.

648 P.2d at 84 (footnotes omitted).

5. Earlier in the sentencing hearing the trial judge expressed another view of the role of aggravating circumstances which might be construed to be incorrect. The court in explaining the sentencing procedure to the defendant stated: "And ... the court does have some discretion but I am somewhat bound—I am not thoroughly bound, but if the aggravating circumstances are proved beyond a reasonable doubt, then it becomes my responsibility to inflict the death penalty." To the extent that this statement indicates that the trial judge was of the view that he had a duty to inflict the death penalty if he found that the aggravating circumstances outweighed the mitigating circumstances, that was plainly error. We do not suggest, however, that that is the only reading of the above statement and do not necessarily suggest that the trial judge was of such a view. We raise the point to make certain that there is no confusion on this important point.

648 P.2d at 84. In reality, there is no real weighing process; the factors that are evaluated and "weighed," or balanced against each other as mitigating and aggravating circumstances, are not, in truth, weighable, as are physical items that have mass and can be compared in the pans of a scale. These factors have largely subjective value and therefore vary in their "weight" or persuasiveness for or against the death penalty with each judge or juror according to his or her own background and prior experiences.

Furthermore, the reality of the sentencing hearing cannot be ignored. The psychological reality is that the aggravating circumstances adduced in a first degree murder case will virtually always "outweigh," or be more "compelling," than the mitigating circumstances. That is so because the commission of a capital homicide, i.e., an intentional murder, is one of the most heinous acts known to society. The sheer emotional impact of all the evidence of an unjustified killing tends to overwhelm evidence of mitigating factors in the mind of the sentencing authority. The immediacy of the evidence and the vividness of the details of the homicide almost always loom so large in the minds of those assessing or "weighing" the aggravating and mitigating factors as to immediately overshadow all other factors that may have a mitigating effect.

But the Eighth Amendment to the United States Constitution does not permit the death penalty to be imposed for every intentional homicide. To avoid having the first part of the *Wood* test produce an unduly broad application of the ultimate sanction, *Wood* also requires the sentencing authority to take a long, hard second look at the totality of the circumstances in light of societal values and the high value that this state and the Eighth Amendment place on the value of all human life and the humanity of every human being, no matter how depraved he or she may have become or how far he or she may have fallen from the norms of a civilized society. It is in applying the second part of the test that the sentencing authority may rely on leniency to refuse to impose the death penalty, "[e]ven in the face of overwhelming aggravating evidence...." *Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring). After considering all aspects of the case, in addition to the particular aggravating and mitigating circumstances relied on by the State and the defendant, the sentencing authority must be persuaded beyond a reasonable doubt that the imposition of the death penalty is "justified and appropriate" in the circumstances. *Wood*, 648 P.2d at 84. Thus, the sentencing authority may refuse to impose the death penalty even though it concedes that the aggravating circumstances "outweigh" the mitigating circumstances beyond a reasonable doubt.

While this state has embraced capital punishment, the statutory scheme and its implementation narrow the numbers of those who may be sentenced to death, as required by the Eighth Amendment to the United States Constitution, so that those who are so sentenced are not sentenced capriciously. That is constitutionally mandated by well-established case law. Our standards serve the goals of both "measured, consistent application and fairness to the accused." *Eddings v. Oklahoma*, 455 U.S. 104, 111, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); *see also Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

For the foregoing reasons, the conviction is affirmed and the sentence of death is vacated, and the case is remanded to the trial judge for a new penalty hearing pursuant to § 76–3–207(4) (Supp.1988).

DURHAM and ZIMMERMAN, JJ., concur.

HALL, C.J., and HOWE, Associate C.J., concur in the result.